| | | |
|---|---|---|
| **JAMES SWAPSHIRE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:10cv2105 TCM** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (the Commissioner), denying James Swapshire's application for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. § 401-433, is before the undersigned with written consent of the parties pursuant to 28 U.S.C. § 636(c).

## Procedural History

The procedural course of this matter is not linear and begins with James Swapshire (Plaintiff) applying for DIB in April 2009 alleging he was disabled as of July 1, 2003,[1] by knee problems, congestive heart failure, diabetes, high blood pressure, and arthritis. (R. at 148-51, 177, 1120.) He had stopped working, however, on December 31, 2000, when he was laid off. (Id. at 177.) The month after a hearing was held in April 2010 before an Administrative Law Judge (ALJ) – a hearing at which Plaintiff and a medical expert testified

---

[1]Plaintiff originally alleged a disability onset date of December 1, 2002, but amended it at the first hearing to be the day before 50th birthday.

– the ALJ determined that an earlier decision was final and binding and dismissed Plaintiff's application.[2]  (Id. at 10-11.)  Plaintiff's request for review was denied by the Appeals Council.  (Id. at 1-2.)  Plaintiff then sought judicial review.  (Compl., ECF No. 1.)  On motion of the Commissioner, the case was reversed and remanded for a substantive decision.  (Order of Feb. 11, 2011, ECF No. 15.)

Another hearing was held before the same ALJ.  (R. at 1035-67.)  Plaintiff, a medical expert, and a vocational expert testified.  (Id.)  The ALJ dismissed the application, disagreeing with the Commissioner that he had earlier improperly applied the doctrine of *res judicata*.  (Id. at 189-91.)  Plaintiff requested review.  (Id. at 1208.)  The Appeals Council remanded the case and directed the ALJ to decide whether Plaintiff was disabled from January 29, 2004, through December 31, 2004 – the date he was last insured for purposes of DIB.  (Id. at 1095-96.)  The ALJ then determined that Plaintiff was not disabled during the relevant period.[3]  (Id. at 1025-30.)  Following the Appeals Council's denial of Plaintiff's request for review, the Commissioner moved to reopen the case.  The motion was granted.

### Testimony Before the ALJ

---

[2]Plaintiff's prior DIB application had been denied at the initial level in September 2005 and not pursued further.  (Id. at 185.)

[3]A hearing was convened in December 2012; however, Plaintiff elected to rest his case on his April 2010 testimony.  (Id. at 1070.)

At the beginning of the first hearing Plaintiff's counsel advised the ALJ that it was "a grid case"[4] and that Plaintiff was basing his disability claim on bilateral knee problems and congestive heart failure. (Id. at 1103.) Drugs and alcohol were not material. (Id.)

Plaintiff testified that he was then fifty-six years old and left school after the eleventh grade. (Id. at 1104.) He received an honorable discharge after an approximately eighteen-month term in the Air Force. (Id.) Plaintiff receives medical treatment at the Veterans Administration (VA) hospital and has a non-service pension. (Id. at 1108.)

Most of his jobs have been in maintenance. (Id. at 1105-06.) He has also done custodial work and worked on asphalt. (Id. at 1106-07.) The last job he held was in 2003 working for a parks department. (Id. at 1128.) It was seasonal work. (Id. at 1129.) He has not looked for work since. (Id. at 1130.) Later in the hearing, Plaintiff clarified that he had worked for the Department of the Interior in 1999 and as a custodian for a hotel in 2000. (Id. at 1146.) He has not worked since. (Id. at 1146-47.)

Plaintiff was treated in 2003 for knee pain. (Id. at 1109.) He had arthroscopic surgery in 1989 on each knee; it made the pain worse. (Id. at 1109-10, 1125.) His pain then was sharp, and continues to this day. (Id. at 1110.) His right knee is worse than his left. (Id.) On a scale from one to ten, his right knee pain was currently a seven and was a nine in 2003. (Id. at 1111.) Both knees and a foot are swollen. (Id. at 1112.) He applies ice to them at

---

[4]Counsel is clearly referring to the Medical-Vocational Guidelines (the "Grids"). These Guidelines may be used when the claimant does not suffer from a nonexertional impairment or when a nonexertional impairment does "not diminish or significantly limit the claimant's residual functional capacity to perform the full range of Guideline-listed activities." **Baker v. Barnhart**, 457 F.3d 882, 894 (8th Cir. 2006) (interim quotations omitted).

least twice a week, currently keeps them elevated 45 to 50 percent of the day, and kept them elevated approximately 60 percent of the day in 2003. (Id. at 1112-13.) He can stand in one place for approximately an hour before having to sit down. (Id. at 1113.) In 2003, he could stand for a couple of hours. (Id. at 1114.) He has started using a cane because he might fall down when he catches his breath. (Id. at 1131.) He had been prescribed a knee brace by the VA physicians. (Id.) He stopped using it when he stopped working. (Id. at 1133.)

His doctors have given him pain medication, but have not recommended any knee replacement surgery. (Id. at 1111-12.)

He cannot get his breath because of his congestive heart failure, and his heart flutters. (Id. at 1115.) He has fluid on his lungs, and has had since 2002. (Id. at 1116.) He gets short of breath when walking. (Id.) He has used inhalers since 1991. (Id. at 1119.) And, he has been diagnosed with diabetes but does not take any medications for it. (Id.)

Plaintiff last drunk alcohol approximately six months before the hearing. (Id. at 1118.) He last used cocaine one year earlier. (Id.) During the relevant period, he was drinking alcohol – beer and whiskey – about three times a week. (Id. at 1136.) A pint would last two days. (Id.) He never drank to intoxication. (Id. at 1138.) He was also putting cocaine in his marijuana cigarettes. (Id. at 1140.)

When questioned by the ALJ, Plaintiff explained he stopped working in 2000 because his knees went out on him and he could not stand long enough to perform his job. (Id. at 1121.) He also could not do a sit-down job because he had hemorrhoids; he no longer does. (Id. at 1121-22.) The hemorrhoids were removed in 1989, but he did not have a sit down job

he could do then.  (Id. at 1122.)  If somebody had had such a job for him, he perhaps could have done it.  (Id. at 1123.)  In 2000, he could have been on his feet for four hours, but once he sits down he cannot get back up and stay on his feet for any length of time.  (Id. at 1124.)

During a normal day, Plaintiff is on his feet for approximately thirty minutes.  (Id. at 1133.)  Mainly, he sits and watches television.  (Id.)

Asked if he could recall for how long he could be on his feet in December 2004, Plaintiff replied that he could not remember.  (Id. at 1134.)  No one at the VA has placed any restrictions on how long he can be on his feet or on how much he can lift.  (Id.)  No one has told him what he can and cannot do.  (Id. at 1135.)  Plaintiff also testified that the VA doctors told him when he was last there four or five years ago that he cannot work because of his heart.  (Id. at 1141-42.)

Asked about references in the medical records to how much he was spending on drugs and alcohol at one point, Plaintiff denied spending $600 a week.  (Id. at 1150.)  He did do some plumbing work to earn money and was paid in cash.  (Id. at 1151.)  He owes taxes on that money, but it "wasn't that much.".  (Id.)  Plaintiff could not recall when he stopped doing the odd jobs, but thought it was in 2004.  (Id.) 1152.)

Morris Alex, M.D., testified as a medical expert.  Having reviewed the medical records, Dr. Alex responded to the ALJ's question about whether Plaintiff had a medically determinable impairment on or before December 31, 2004.  (Id. at 1147-48.)  He replied that Plaintiff's diabetes mellitus does not satisfy a listing because there is no end organ disease and he is on no medication for it, although he does have increased blood pressure.  (Id. at

1148.) X-rays had shown some evidence of minimal degenerative arthritic changes in his knees and some old ligament injury. (Id.) The majority of the medical records during the relevant period concerned substance abuse. (Id. at 1149.) When Plaintiff was detoxified, he functioned okay. (Id. at 1150.) Since 2009, Plaintiff meets the criteria in Listing 4.02(a)(1) for systolic failure. (Id. at 1153.) The records reflect that Plaintiff began to complain of heart-related symptoms in 2009. (Id. at 1154.) There was no evidence that the effusion on his knees was so severe that further evaluation was required after the knees were tapped. (Id. at 1155, 1157.)

At the second, July 2011 hearing, Plaintiff testified that he had had arthroscopic surgery on his right knee in the 1980s and another surgery on that knee in the 1990s to remove a chipped bone. (Id. at 1041-42.) His knee improved for a short time thereafter, but then started swelling. (Id. at 1042.) Consequently, he could not work like he used to do. (Id. at 1043.) He had one surgery on his left knee; this was in the 1990s. (Id. at 1044.) When his knees became swollen, he would soak them in warm water and rub them with alcohol. (Id.) He was on pain medications, but could not recall the names. (Id. at 1044-45.) He thought his earlier testimony that he could stay on his feet for four hours during the relevant period was optimistic; two hours was more accurate. (Id. at 1045.)

Asked about a reference to chronic obstructive pulmonary disease (COPD), Plaintiff explained that he used to smoke. (Id. at 1046.) He quit a year ago. (Id.)

Also affecting his ability to work were his heart problems and high blood pressure. (Id. at 1047.) His heart problems made him tired. (Id. at 1048.)

William Newman, M.D., testified as a medical expert. He is a board-certified orthopedist. (Id. at 1050.) Asked if he could offer a medically-certain diagnosis for the period between January 29, 2004, and December 31, 2004, Dr. Newman replied that an April 2003 x-ray showed fluid in the left knee and another showed fluid in the left elbow. (Id. at 1051.) Later x-rays showed mild arthritis in both knees. (Id. at 1051-52.) That was in 2009; hence, the arthritis could not have been worse in 2004. (Id. at 1053.) The fluid in the elbow is "a pretty common condition." (Id. at 1054.) He opined that Plaintiff would have been limited to light work in 2004. (Id. at 1056.) Any limitations would be related to squatting, crawling, and kneeling. (Id. at 1058.) Dr. Newman further explained that the fluid would be removed after it built up. (Id. at 1059.)

Jeffrey Magrowski, Ph.D., testified as a vocational expert. He was asked to assume a hypothetical claimant who is limited to light lifting and carrying; able to sit, stand, and walk each about six hours in an eight-hour day; and not able to kneel, crawl, or climb ladders, ropes, or scaffolds. (Id. at 1064.) Dr. Magrowski opined that this claimant cannot return to Plaintiff's past relevant work, but can engage in any form of light work. (Id. at 1064.) He then gave three examples of such jobs. (Id. at 1064-65.)

If this hypothetical claimant cannot be exposed on a concentrated basis to hot or cold temperatures or to respiratory irritants, the cited jobs would not be affected. (Id. at 1965.) His testimony was consistent with the *Dictionary of Occupational Titles* (DOT). (Id. at 1065-66.)

## Records Before the ALJ

On a Function Report completed when applying for DIB, Plaintiff explained that his knees hurt when he squats, bends, stands, kneels, walks, and sits. (Id. at 168.) He cannot walk farther than a block before having to stop and rest for fifteen minutes. (Id.) He attends church every week, shops for clothes and food every month for two to three hours, and prepares his own meals for an hour every day. (Id. at 165-67.) He uses a cane and braces, prescribed two or three years earlier, when he is having problems with his legs once a month or more often. (Id. at 169.)

Plaintiff's earnings record list 2000 as the last year in which he had reportable income. (Id. at 115.) That year he earned $6,264[5]; the year before he earned $5,928; and, in 1998, he earned $625. (Id.) His annual earnings in 1995, 1996, and 1997 averaged $21,024. (Id.) In 1994, his earnings were at their highest – $29,299. (Id. at 140.)

The medical records before the ALJ are summarized below in chronological order. Only those relating to the period in question, including records of treatment before and after then that are relevant to that period, are included.

In June 2000, Plaintiff was admitted to the VA hospital[6] after drinking heavily and using cocaine. (Id. at 254-58, 284, 552-86.) He had been depressed. (Id. at 254.) He reported having two chronic medical problems – diabetes and bronchitis – that interfered with his life. (Id. at 562.) He had, however, experienced no medical problems in the thirty days prior to admission. (Id.) He "consider[ed] treatment for medical problems to be not at

---

[5]All amounts are rounded to the nearest dollar.

[6]Unless otherwise noted, all health care providers were at the VA hospital or clinics.

all important." (Id.) Treatment for alcohol and drug problems was "extremely important." (Id. at 563.) His past medical history included an injury to his knee (which knee is not specified). (Id. at 569.) It was noted that Plaintiff reported spending about $600 a week on alcohol and crack cocaine. (Id. at 284-88.) Elsewhere in the record he reported smoking $200-500 of drugs every other day. (Id. at 287.) He did odd jobs to get the money. (Id. at 284.) He daily drank one-fifth of hard liquor and six beers. (Id. at 255.) He was discharged seven days after admission.

In October, he was treated for complaints of ankle and back pain for the past several weeks. (Id. at 535-41.) Otherwise, he was doing well. (Id. at 535.) He was prescribed Tylenol for the back pain and was to have x-rays taken of his ankle. (Id. at 536.)

Plaintiff was again admitted to the VA on April 9, 2001, after going to the emergency room with complaints of depression with suicidal ideation. (Id. at 251-54, 282-84, 505-.) He had recently broken up with his girlfriend of twenty-three years because of his cocaine and alcohol abuse. (Id. at 252, 511.) As before, he daily drank one-fifth of hard liquor and six beers. (Id. at 252.) When discharged on April 13, his diagnoses included substance induced mood disorder; alcohol/cocaine dependence; ethanol/cocaine abuse; personality disorder, not otherwise specified; diabetes mellitus; osteoarthritis; and chronic bronchitis.

(Id. at 251.)  His Global Assessment of Functioning (GAF) was 55[7]; it had been 30 when he was admitted.[8]  (Id. at 252.)

After discharge, Plaintiff participated in the VA's lodger Substance Abuse Treatment Program (SATP) from April 13 to 27.  (Id. at 449-506.)  When interviewed about his psychosocial history, Plaintiff reported that he had no chronic medical problems that interfered with his life.  (Id. at 475.)  Indeed, in the past thirty days, he had had no medical problems.  (Id.)  He had twelve years of education and four months of technical training.  (Id. at 476.)  He had only worked part-time in the past three years.  (Id.)  In the past month, he had spent $150 on alcohol and $1000 on drugs.  (Id. at 476-77.)

In October 2002, Plaintiff had x-rays taken of his left ankle; they revealed no fracture, dislocation, or arthritic change.  (Id. at 217-18.)  X-rays of his chest showed no active pulmonary disease.  (Id. at 218.)  Four days later, he was seen at the VA for evaluation and treatment of a cough he had had for the past few weeks.  (Id. at 446-49.)  Chest x-rays were again taken; they were normal.  (Id. at 217.)

-----

[7]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'"" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV-TR at 34 (emphasis omitted).

[8]A GAF score between 21 and 30 indicates "[s]ome danger of hurting self or others . . . or occasionally fails to maintain minimal personal hygiene . . . or gross impairment in communication."  DSM-IV-TR at 34 (emphasis omitted).

In April 2003, Plaintiff saw a physician assistant's at the VA for complaints of pain in his left knee for the past two weeks after he struck that knee in a fall. (Id. at 229-31.) On examination, he had full range of motion with pain in his left knee and hip. (Id. at 230.) He was diagnosed with a strain of his left knee and hip and effusion in the left knee, and was prescribed Naprosyn (a nonsteroidal anti-inflammatory drug). (Id.) He was to return in one week. (Id.) X-rays of the knee revealed a large joint effusion, but no fractures or dislocations. (Id. at 216.)

Plaintiff returned to the VA in August, complaining of swelling his right knee for the past six to seven months and in his left elbow for the past four weeks. (Id. at 280, 229.) It was noted that he could bear weight without difficulty. (Id.) He was diagnosed with left elbow olecranon bursitis and right knee prepatellar bursitis. (Id.)

The following month, he consulted with a VA orthopedic surgeon; fluid was aspirated from his left elbow and left knee. (Id. at 280-81, 442.) The next day, he was fitted with a hinged left knee brace and a sleeve for his right knee to address the acute effusion in his right knee and acute strain in his left knee. (Id. at 276-79, 227.)

Two weeks later, on September 26, Plaintiff saw a VA physician's assistant for the effusion in his left elbow and knee and in his right elbow. (Id. at 441.) The left knee was aspirated. (Id.) No fluid was able to be drawn from the right elbow. (Id.) Plaintiff was to be scheduled for a bursectomy. (Id.) Later the same day, he saw a psychiatrist and reported that his left knee and elbow pain was aggravated by lifting, standing, and walking. (Id. at 440.)

On October 20, Plaintiff was admitted to the VA hospital after going to the emergency room and complaining of being "stressed out due to his use of alcohol and drugs. Says that he lost his family because of this." (Id. at 244-51, 272-76, 373, 377-436.) He further stated that he had been suicidal, but had no suicidal ideation or plan. (Id. at 244, 404.) He had been depressed. (Id.) He no longer worked due to knee problems. (Id. at 406.) He reported smoking $100-200 of crack cocaine whenever he had the money. (Id. at 417.) The admitting nurse noted that his "self-report of pain correspond[ed] with his non-verbal pain behaviors." (Id. at 419.) His medical history included surgery on both knees in 1991 and 1994 due to cartilage erosion. (Id. at 246.) He reported that he had not been employed since 2001 due to knee problems and had two years of college education. (Id. at 247.) On examination the next day, he had 5/5 motor strength in his upper and lower extremities and a normal gait. (Id. at 408.) His mood was slightly depressed; his affect and memory were appropriate; his thought process was logical and goal-oriented; his concentration and orientation were normal; and his insight was good. (Id. at 408-09.) During his hospitalization, he initially spent his days in bed sleeping. (Id. at 250.) He soon wanted to be taken off suicide precautions so he could smoke. (Id. at 250, 412.) He later participated in various therapy groups. (See e.g. id. at 377-81, 383, 388-89, 392-93, 397-98.) At one point, Plaintiff complained of knee pain, reporting that his knee (which is not specified) constantly bothered him and he hoped to get disability for it.[9] (Id. at 379.) As he wished, he remained until a bed was available in the SATP. (Id. at 250.) He was discharged on October 31 with diagnoses

_____

[9]A VA social worker helped Plaintiff apply for disability in April 2009. (Id. at 750..) Plaintiff was then waiting for glasses and could not see the application. (Id.)

alcohol and cocaine dependence; substance induced mood disorder; personality disorder, not otherwise specified; diabetes mellitus; hypertension; and a mild urinary tract infection. (Id. at 244.) His GAF, which had been 35 on admission, was 75 on discharge.[10] (Id.) His medications on discharge included Albuterol, artificial tears, acetaminophen, indomethacin (for pain), and hydrochlorothiazide (to treat fluid retention), and citalopram (an antidepressant). (Id. at 250-51, 374.) On examination at discharge, he had 5/5 strength in his upper and lower extremities and a normal gait. (Id. at 248.) His mood was slightly depressed, but better; his affect was appropriate; his thought process was logical and goal-oriented; his concentration was normal; his recent and remote memory was normal; his judgment was fair; his insight was good. (Id. at 249.) He was oriented to time, place, and person. (Id.) His speech was spontaneous and normal. (Id. at 250.)

On discharge, Plaintiff was admitted to the lodger SATP and was discharged from there fourteen days later. (Id. at 310, 351.) He was then in good spirits with a normal mood and affect and was to come back for aftercare. (Id. at 310.)

In February 2004, Plaintiff saw C.J. Jos, M.D., a VA staff psychiatrist. (Id. at 302-04.) It was noted that he was staying clean, wanted to go back on medication, had missed an appointment with his primary care physician, and had arthritis of the knee. (Id. at 304.)

In June, Plaintiff did see a VA primary care physician for a routine follow up. (Id. at 296-302.) He reported having no chest pain, shortness of breath, or gastrointestinal

---

[10]A GAF between 71 and 80 indicates that "[if] symptoms are present, they are transient and expectable reactions to psychosocial stressors . . . ; no more than slight impairment in social, occupational, or school functioning . . . ." DSM-IV-TR at 34.

problems.  (Id. at 297.)  On examination, he was "a little tender at knees." (Id. at 298.)  Other than that and a rash, the examination was normal.  (Id.)  A nurse answered "No" to the question whether Plaintiff's "self-report of pain correspond[ed] to his non-verbal pain behaviors." (Id. at 302.)  Her source of information about that pain was Plaintiff.  (Id.)  He was to return in two to three months for chest x-rays and an electrocardiogram (EKG).  (Id. at 299.)  The same day, a blood pressure monitor with cuff and glucose monitoring kit were delivered to Plaintiff's home.  (Id. at 262-68.)

Plaintiff did not appear for a scheduled diabetes nutrition class on July 2; the class was not to be rescheduled unless he or his primary care physician contacted the nutritionist.  (Id. at 268-69, 293.)

On July 19, Plaintiff again saw Dr. Jos for supportive psychotherapy.  (Id. at 290-91, 868-69.)  His mood and affect were normal.  (Id. at 291.)  He was not suicidal or aggressive. (Id.)

One year later, in July 2005, x-rays were taken of Plaintiff's knees.  (Id. at 897-98.) There were no fractures, dislocations, or arthritic changes.  (Id.)  X-rays were taken again the following September.  (Id. at 896-97.)  These showed mild narrowing of medial compartment of each knee space, but no fracture or dislocation.  (Id.)

Plaintiff was admitted to Christian Hospital on October 14 after going to its emergency room the day before for complaints of left lower chest and rib cage pain that began after he fell down some stairs a few weeks earlier.  (Id. at 981-1021.)  Chest x-rays taken in the emergency room showed cardiomegaly and congestive heart failure.  (Id. at 985,

1004-05.)  A computed tomography (CT) scan showed a large left pleural effusion.  (Id. at 985, 1002.-03)  A review of his systems was negative for joint pain, with the exception of his chronic knee pain.  (Id.)  On examination, he had a normal range of motion in his all extremities.  (Id. at 993.)  While hospitalized, fluid was drained from his left chest, after which the remaining effusion was very small.  (Id. at 981.)  He was discharged on October 18 after having a clear lung exam.  (Id. at 981, 1001.)  He was encouraged to stop smoking and was to follow up at the VA.  (Id. at 981.)

From December 14 to 21, Plaintiff was hospitalized at the VA for recurrent left pleural effusion, during which a tube was inserted into his left chest for the aspiration of fluid.  (Id. at 807-38, 885-94, 928-34.)  During his stay, an appointment for an orthopedic evaluation was rescheduled until February 2006 due to his hospitalization.  (Id. at 964.)  The evaluation was to investigate his complaints of chronic knee pain for the past six months.  (Id. at 965.)  It was noted that he had not shown for a November consultation.  (Id. at 966.)  It was later noted that he also did not show for his rescheduled 2006 appointment.  (Id.)

On January 4, 2006, Plaintiff reported during a pulmonary consultation that he had worked in heating and air conditioning until 1997, when he quit "secondary to muskuloskeletal [sic] pain."  (Id. at 802.)  Knee pain had been listed as an active problem the day before when he saw a primary care physician.  (Id. at 804.)

When being seen three days later for a consultation about his mild congestive heart failure, Plaintiff reported that he was able to ambulate without difficulty.  (Id. at 798-99.)  He had no swelling in his legs.  (Id. at 798.)  Chest x-rays showed a decrease in the left

pleural effusion.  (Id. at 882-83.)  His heart size and pulmonary vasculature were within normal limits.  (Id. at 882.)  There were no signs of pneumothorax or pneumonia.  (Id.)

In March, x-rays of his knees revealed degenerative joint disease in both knees and effusion in the left knee.  (Id. at 879-82.)

In April 2008, chest x-rays revealed chronic left pleural effusion or thickening and left lower lobe atelectasis.  (Id. at 593.)  Plaintiff requested refill of medications that he had run out off "'sometime ago.'"  (Id. at 638, 974.)

During a check-up in September, Plaintiff was encouraged by the physician to engage in regular exercise to lower his blood pressure.  (Id. at 632-37.)

In October, Plaintiff consulted a VA psychologist for complaints of being "'stressed out'" due to his financial situation, medical problems (particularly his congestive heart failure), and the recent death of his brother. (Id. at 609-12.)

X-rays taken of Plaintiff's right knee in December showed minimal tricompartmental degenerative arthritis.  (Id. at 592, 652-53.)  There was an increase since March 2006.  (Id. at 592.)

Plaintiff was seen at the VA in April 2009 for treatment of shortness of breath on exertion; mild mitral insufficiency and regurgitation; mild central aortic regurgitation; moderate global left ventricular systolic dysfunction; and large left pleural effusion.  (Id. at 587-89.)  Chest x-rays revealed a clear right lung and persistent chronic left pleural effusion or thickening; there were no significant changes since the April 2008 x-rays.  (Id. at 651-52.) X-rays of his right knee showed mild degenerative changes in the medial compartment of the

tibia femoral joint; there were no significant changes since the December 2008 x-rays. (<u>Id.</u> at 650.)  A prominent patellar spur was again noted.  (<u>Id.</u>)  There were mild, degenerative changes in the medial compartment of the tibia femoral joint in his left knee and in its patella femoral joints; again, there were no significant changes.  (<u>Id.</u> at 650-51.)

It was noted in Plaintiff's medical records in September that he had congestive heart failure and COPD.  (<u>Id.</u> at 682.)  The same day, he tested negative for depression.  (<u>Id.</u> at 746.)

During an October gastroenterology consultation, Plaintiff reported last using cocaine a few months earlier.  (<u>Id.</u> at 691,737.)

Also before the ALJ was a Psychiatric Review Technique Form completed by Marsha Toll, Psy.D., in May 2009 assessing Plaintiff's mental impairments for the period from December 1, 2002, to December 31, 2004.  Dr. Toll concluded that there was insufficient evidence of Plaintiff's possible affective disorder, personality disorder, and substance addiction disorder.  (<u>Id.</u> at 196.)  She noted that he did not allege any disability attributable to a psychiatric impairment and had limited treatment during the relevant period.  (<u>Id.</u> at 206.)

## The ALJ's Decision

When reaching the merits of Plaintiff's DIB application, the ALJ found that he met last met the insured status of the Act on December 31, 2004.  (<u>Id.</u> at 1025.)  The period at issue was from January 29 to December 31, 2004.  (<u>Id.</u>)  During this period, Plaintiff did not engage in substantial gainful activity, nor did he have a severe impairment.  (<u>Id.</u> at 1027.)  Plaintiff's allegations of having arthritis, congestive heart failure, gout, and COPD failed

because there was no medical evidence he had any of these impairments during the relevant period. (Id. at 1028.) There was such evidence of hypertension and diabetes; however, the evidence indicated that both were controllable. (Id.) Addressing Plaintiff's claims of a disabling knee condition, the ALJ noted that Plaintiff had had knee surgeries in 1991 and 1994 and had experienced joint effusion in his left knee in 2003. (Id.) The ALJ accepted Dr. Alex's opinion that the knee problems did not create any limitation during the relevant period, finding that opinion to be consistent with the medical record, including the evidence of a normal gait in 2003 and the generally normal findings in a June 2004 examination. (Id.) The ALJ did not accept Plaintiff's description of limitations caused by knee pain, finding he lacked credibility as demonstrated by cited inconsistencies in the record, including in the various disability onset dates given in his applications and in the lack of any restrictions imposed on him by physicians during the relevant period. (Id. at 1028-29.) Alternatively, even if Plaintiff had a severe musculoskeletal impairment during the relevant period, considerable weight was given the opinion of Dr. Newman about his residual functional capacity (RFC) and of Dr. Magrowski about the jobs someone with that RFC can perform. (Id. at 1029.) Therefore, Plaintiff was not disabled during the relevant period within the meaning of the Act. (Id.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve

months or be expected to result in death. 42 U.S.C. § 423(d)(1). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. § 404.1520(a)). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational

requirement.  See 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)).  This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "'The credibility of a claimant's subjective testimony is primarily for

the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the *Polaski* factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f). The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008)); <u>accord</u> **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting <u>Goff v. Barnhart</u>, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

## Discussion

Plaintiff argues the ALJ fatally erred by improperly evaluating the evidence (specifically, evidence of his knee pain and the resulting limitations) and his credibility when finding he had no disabling impairment between January 29, 2004, and December 31, 2004.

Plaintiff alleged in April 2009 that he was disabled by knee problems, among other impairments,[11] as of December 2002. The regulations provide that a claimant's allegedly disabling "impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms . . . ." 20 C.F.R. § 404.1508. "In the absence of a showing that there is a 'medically determinable physical or mental impairment,' an individual must be found not disabled at step 2 of the sequential evaluation process." Social Security Ruling 95-4p, 1996 WL 374187, *1 (S.S.A. July 2, 1996). "No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be . . . " Id.

The first reference to any knee problem in Plaintiff's medical records appears in June 2000 when it is noted that his *past* medical history includes an injury to his knee (which one is not specified). Later records refer to arthroscopic surgery on his knees in, at the latest, the 1990s. The first *complaint* of knee pain appears in April 2003. The pain was attributed to a fall and was reported to have begun two weeks earlier. Plaintiff was diagnosed with a strain and effusion of the left knee and prescribed an anti-inflammatory drug. Four months later, Plaintiff complained of *right* knee pain for the past six to seven months. He had no difficulty bearing weight. Fluid was aspirated from his left knee the next month and he was fitted with

---

[11]Plaintiff cited other impairments, e.g., congestive heart failure and diabetes, but focuses his argument only to his knee problems and arthritis.

a brace for that knee and a sleeve for the right knee.[12] Plaintiff's left knee was aspirated again in September. When hospitalized the next month for substance abuse problems, Plaintiff had a normal gait and 5/5 motor strength in his upper and lower extremities. See **Wright v. Colvin**, — F.3d — , slip op. 14-2834 at 5 n.2 (8th Cir. June 15, 2015) (noting that the court has "interpreted 5/5 strength test results to represent normal or maximum muscle strength" when rejecting the opinions of the claimant's treating physicians on the severity of his knee problems). The next medical record is from June 2004 and was for a routine follow-up examination; Plaintiff had "a little" tenderness in his knees. (R. at 298.) One year later, in July 2005, x-rays of his knees showed no fractures, dislocations, or arthritic changes. X-rays taken that September showed no fracture or dislocation and only mild narrowing of the medial compartment of each knee. See **Id.** at *5 (finding substantial evidence supported ALJ's decision that knee pain was not disabling when x-rays consistently showed no fractures and minimal degenerative changes). In October, Plaintiff had a normal range of motion in all his extremities. In January 2006, he had no swelling in his legs and was able to walk without difficulty. Moreover, after an orthopedic consultation scheduled in December 2005 to investigate Plaintiff's complaints of knee pain had to be rescheduled, Plaintiff did not kept the new appointment. See **Bernard v. Colvin**, 774 F.3d 482, 487 (8th Cir. 2014) (failure to keep

---

[12]Plaintiff cites the use of a brace as evidence that his knee pain was disabling in 2004. The brace for the left knee and a sleeve for the right were prescribed in September 2003. When applying for DIB in April 2009, he reported that he used a cane and braces approximately once a month. When testifying in 2010,, he stated that he stopped using the brace when he stopped working. He last had reported earnings in 2000. The medical records include his reports of doing occasional jobs in 2000 and 2001 to earn money to buy drugs. Given the varying accounts of when Plaintiff wore a brace and when he stopped, his reliance on its prescription is misplaced.

appointment for treatment of impairment inconsistent with allegation impairment disabling). When seen for a check-up in September 2006, Plaintiff was encouraged to exercise. See **Myers v. Colvin**, 721 F.3d 521, 527 (8th Cir. 2013) ("[A] physician's unrestricted recommendations to increase physical exercise are inconsistent with a claim of physical limitations.").

Thus, while the medical records support the presence of occasional knee pain before January 29, 2004, tenderness in his knees once during 2004, and occasional knee pain after December 31, 2004, there is no evidence that any degenerative condition manifested itself during the relevant period. Indeed, when complaining in December 2005 of chronic knee pain, Plaintiff described it as being present for the past *six months*.

"To support the award of disability benefits, a disease must have progressed from latency to a level constituting severe impairment as defined under Title II before the expiration of the insured period." **List v. Apfel**, 169 F.3d 1148, 1149 (8th Cir. 1999). "Retrospective medical diagnoses constitute relevant evidence concerning the degree of disability prior to the expiration of the insured period." **Id.** "However, evidence outside the relevant time period cannot serve as the only support for the disability claim. Such a holding would be contrary to the Social Security Act, 42 U.S.C. §§ 416(I), 423(c)." **Pyland v. Apfel**, 149 F.3d 873, 878 (8th Cir. 1998). See also **Turpin v. Colvin**, 750 F.3d 989, 994 (8th Cir. 2014) (evidence that a claimant's health worsened after her date last insured does not demonstrate disability during the relevant time period); **Moore**, 572 F.3d at 522 (claimant

must "establish her being disabled prior to the expiration of her insurance to be entitled to [DIB]").

The ALJ had before him the testimony of a medical expert, Dr. Alex, that based on his review of the medical records, Plaintiff did not have a disabling impairment, including knee problems, before December 31, 2004. The only evidence contradicting that position is Plaintiff's hearing testimony[13] and report statements given more than five years after the relevant period. The ALJ did not err in finding that Plaintiff did not have disabling knee pain from January 29, 2004, to December 31, 2004. See **Ponder v. Colvin**, 770 F.3d 1190, 1194 (8th Cir. 2014) (affirming adverse decision when claimant failed to report conditions and symptoms she claimed were disabling during relevant period when being evaluate during that period).

Plaintiff also argues that the ALJ improperly evaluated his credibility. As noted above, "[a] physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms . . . ." 20 C.F.R. § 404.1508. Although there was some evidence of a knee impairment, e.g., strain of his left knee, right knee prepatellar bursitis, mild narrowing of the medial

---

[13]Plaintiff's challenge to the ALJ's adverse credibility determination is addressed below.

compartment, or[14] mild degenerative arthritic changes in each knee, the severity[15] of that impairment during the relevant period is entirely dependent on Plaintiff's credibility.

The ALJ discounted Plaintiff's credibility due to inconsistencies in the record. "'An ALJ . . . may disbelieve subjective reports because of inherent inconsistencies or other circumstances.'" **Wright**, slip op. 14-2834 at 10 (quoting <u>Travis v. Astrue</u>, 477 F.3d 1037, 1042 (8th Cir. 2007)) (alteration in original). In that case, the court affirmed an adverse credibility determination based, in part, on inconsistencies in the claimant's work history, including the gap between his alleged onset date and when he stopped working. Plaintiff stopped working in 2000; however, his alleged disability onset date was first December 2002 and later amended to be July 2003. Also inconsistent in **Wright**, slip op. 1402834 at 12, was an eight-month period during which the claimant sought no medical treatment at all. There is a nine month gap between Plaintiff seeking medical care in October 2003 (for substance abuse problems) and June 2004 (for a routine follow-up). This is soon followed by a twelve-month gap between July 2004 (when he sought supportive psychotherapy) and July 2005 (when x-rays were taken of his knees).

There are many other inconsistencies. For example, Plaintiff's descriptions to health care providers of how much he was spending on drugs and alcohol varied. See **Whitman v. Colvin**, 762 F.3d 701, 707 (8th Cir. 2014) (discrepancies in claimant's information reported

---

[14]The Court uses the conjunction "or" rather than "and" because the diagnoses of Plaintiff's knee problems generally were not repeated until 2008.

[15]See **Martise v. Astrue**, 641 F.3d 909, 923 (8th Cir. 2011) ("A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities.") (alteration omitted) (internal quotations omitted).

to treating sources detracted from credibility). When questioned about one such report, i.e., the $600 figure, Plaintiff denied doing so. When completing the Function Report, Plaintiff stated he stopped working in December 2000 when he was laid off and not because of his impairments. See **Goff**, 421 F.3d at 793 (noting that "[c]ourts have found it relevant to credibility when a claimant leaves work for reasons other than [his] medical condition"). When testifying at the first hearing, he stated he stopped working in 2000 because of his knees. He testified he was on pain medications, but could not recall the names and his medical records do not identify any. He testified that he was drinking beer and whiskey about three times a week during the relevant period and that a pint would last two days. Medical records indicate he was then drinking a-fifth of liquor and six beers every day.

Also, as noted by the ALJ, the lack of any restrictions placed on Plaintiff by his physicians detracts from his credibility. See **Teague v. Astrue**, 638 F.3d 611, 615 (8th Cir. 2011) (lack of any functional or work related limitations placed on claimant by her doctors due to her allegedly disability impairment was a proper basis for questioning her credibility).

An ALJ's credibility determination is deferred to if "supported by good reasons and substantial evidence, even if every factor is not discussed in depth." **Smith v. Colvin**, 756 F.3d 621, 625 (8th Cir. 2014) (internal quotations omitted). See e.g. **Kamann v. Colvin**, 721 F.3d 945, 952 (8th Cir. 2013) (rejecting challenge to ALJ's adverse credibility determination based on "numerous inconsistencies in [the claimant's] accounts . . ."). The ALJ's determination is so supported.[16]

---

[16]Plaintiff contends that the credibility determination must be set aside because the ALJ did not specify which weight he gave his testimony or which specific statements he found were

## Conclusion

An ALJ's decision is not to be disturbed "'so long as the . . . decision falls within the available zone of choice.  An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'"  **Buckner v. Astrue**, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)).  Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  20th  day of July, 2015.

not credible.  This contention is without merit.  There is no obligation that an ALJ list specific statements found not to be credible.